With that said, calling the matter of In Re Arctic Glacier, and I would call upon Mr. Gordon to go forward for the appellants. Mr. Gordon, you're out there, correct? Yes, I am, Your Honor. Thank you. Okay, let me begin by thanking the court for allowing this argument to take place on my phone. I think I can speak for both counsel when I say we both appreciate the court's courtesy. With that, let me just launch in then. We think that the starting point for this court's analysis should be the Supreme Court's decision in Holliwell Corporation v. Smith, which we cited in our brief. There, the bankruptcy plan was silent as to post-confirmation statutory duties to pay income tax. Ruling in favor of the IRS, the Supreme Court found that the plan's silence did not mean that the debtor could disregard the applicable income tax statute. Rather, the statutory duty to pay still existed. Significantly, the Supreme Court also held that a bankruptcy plan cannot preclude claims that arise post-confirmation, and it also made clear that that was true whether or not the person pursuing the claim had voted to approve the plan. We think Holliwell is right on point. Here, we have a bankruptcy plan that was silent as to the debtor's duties under U.S. security laws, which impose certain post-confirmation obligations on the debtor. The debtor did not comply with those obligations, giving rise to the post-confirmation claims that are being asserted. Counselor, so you're focusing on the plan's silence. You're not asserting that the plan itself affirmatively required the distributions to happen in certain ways then? What we're asserting is that the law required two things. That's part A. And part B is that it required that the distribution be allocated in accordance with the law. So it's just a two-parter. And the plan is silent on both issues. Don't bankruptcy plans frequently require the distribution to be made contrary to law? I'll give you a simple example. Contract law requires that when someone promises to pay someone $100,000 for a product, but yet when the buyer of the product files a Chapter 11 petition and there's a plan of reorganization confirmed, that plan will often say that, no, you don't have to pay the $100,000. You're only going to have to pay a small percentage of that. Well, I think that raises several different issues. The first one, and I think it's the most important one, is whether you're talking about a prospective obligation or an obligation that's already been breached. So our case doesn't involve anything that was breached as of the time of the confirmation. We're only talking about post-confirmation or obligations that did not exist until after confirmation. There are obligations, there are disclosure obligations that only came into play post-confirmation. In addition, I think you're talking about what would be called an executory contract, and the Bankruptcy Code has specific provisions regarding that. The executory contracts are post-petition contracts. I'm talking about a pre-petition contract, where the plan says that you just pay unsecured $0.10 on the dollar after plan confirmation. Well, but I think that in a bankruptcy, if there's a contract that exists pre-filing, and there are obligations on both sides, I think that's what your hypothetical assumes that there's an obligation still. In that case, the debtor can choose to reject the contract, in which case its counterparty becomes a general unsecured creditor, or it can accept the contract, in which case the debtor must comply with the contract. That's not our situation here. This is nothing like it at all. These are obligations that did not exist after confirmation. They are obligations imposed by law that only came into play after confirmation. Right. We agree on that. But isn't it true that those obligations that came into play after confirmation were somewhat in conflict? If the federal rules were strictly adhered to, and the rules of the plan were strictly adhered to, there is some conflict there, is there not? Well, let me break it down into two categories. Under disclosure obligations, there was zero conflict at all. There was none. If you look at the plan, there is virtually nothing in the plan about what the debtor is supposed to do in terms of disclosures following confirmation. Pretty much nothing in there. It's silent. There's only something that says that there has to be a record date 21 days in advance of payment. But it was substantially silent. And it says nothing at all about whether or not disclosures are going to be made in accordance with U.S. security laws. Nothing. Total silence. So it would be impossible for there to be an inconsistency because the plan was silent. And then as to not just disclosure, but as to the law concerning who gets paid the dividend, again, there was a way of reconciling the plan with the law. We have set forth that in our brief. The district court even recognized that there was a way of harmonizing the law with the plan in terms of how the distribution was allocated. So there was a way to do it. Counselor, I think you're being accurate, and I think you are implicitly conceding there's at least substantial tension in the distribution rules, that the plan distribution rules, they don't have an X date in them. The timing rules are different. So there's work that needs to be done to make it fit with the plan. And I think what we need to do here is work through to what extent does a bankruptcy plan preempt FINRA. You seem to be taking the position that it's only if it expressly says don't comply with FINRA that it pushes it aside. I don't think that's actually right. I think there's a level of inconsistency on the distribution end that maybe isn't there with the disclosures. Well, okay. So let me just grab the disclosure point for a second, and then I'll swing back to the distribution issues. We think there is no inconsistency between the plan and the disclosure requirements. There's silence. And I think that the Hollywood case makes that. And there are other cases we've cited, by the way, that says when there's silence, you're supposed to follow the law. And by the way, I mean, to the extent that you're suggesting that a debtor can be free to violate the law, that's just not so. If you look at 11 U.S.C. 1142, what that makes clear is a debtor in executing a plan only is exempt from the law if the law relates to the financial condition of the debtor. It's not exempt from complying with other laws. And I'm not going to go too out there on this, but could you imagine a situation in which a debtor took a position that, for example, it was exempt from, I don't know, the wage and hour laws or environmental laws or food and safety laws? That is roughly equivalent to the position. That could be the result if a debtor is free to disregard the law. I don't think that there's anything in the bankruptcy statutes that exempts a debtor from complying with the law. But I do think that the distributions are related to financial condition. You have a stronger argument on disclosures, but how much the debtor gives out and how much it has left for other claims seems to be a financial condition, pertinent to financial condition. I don't think so. We're talking about the financial condition. That is not the issue in our case. Our issue is not how much they gave out. We're not saying they should have given out more or less. That is not the issue at all. They were giving out the same amount of money no matter what. I mean, it was in the discretion of a monitor, but once it decided to give out a certain amount of money, that was the amount of money it was giving out. The issue was who's getting it at the other end. And what they did was they effectively said, okay, well, the law says who gets it. We're not going to follow that. And they didn't follow that. And that's the problem. So this is not in terms of the allocation issue. That's not about the financial condition of the debtor. This is about who at the other end is getting the money. And the amount doesn't change. Even if you're right on that, you have to overcome the releases. And you have, as I count them, only two objections to the releases. One is this due process, and one is the post-petition activities. You've not challenged the construction of the releases as applying to this. So we have to accept one or the other of those arguments for any of your six claims to survive. Well, I think that there's a little bit more to it.  I don't think there's any way to reconcile Hollingwell with a ruling that a debtor can be released from its post-confirmation activities. No way. And, you know, we've cited Hollingwell. I think if you look at Hollingwell, there's simply no way to reconcile it. So I think as a starting point, we say to you that if you think that the releases exempt them from post-confirmation activities, I don't think that's not considered under Hollingwell. Where have you and where do you in your briefing dispute that Brodsky's claims would fall within the scope of the releases? Well, we're not saying that if the releases, we're not challenging the language on this appeal of the releases. We're not saying that the releases, if they are lawful, and if they could lawfully exempt them, Brodsky would be insufficient or broad to cover their claims. They're really broad releases. Every lawyer knows how to draft a really ultra-broad release, and they did it. Okay. But the next question is, are those valid, and could they possibly extend to my clients? And there's several reasons they can't extend to my clients. The first one is, again, under Hollingwell, you can't eliminate whatever language you choose. You're not allowed to eliminate claims that are based on acts that occur following the releases and injuries that occur following the enactment of the releases. But, okay, let's even move beyond that. My clients never agreed to the releases. What my clients did, and all they did, was buy units on the open market. That's it. The releases are contained in a bankruptcy plan. My client did not vote for the bankruptcy plan. He was not a party to it in any which way. He never agreed with his counterparty, when he acquired his units, to assume their rights and obligations under the plan. But you want the benefits of the distribution under the plan, right? No. That's not actually right. What we want are our rights as unit holders. The law gives my clients rights as unit holders. So all we want are the rights under the law. So you don't want anything from the debtor in this case? You don't want payment from a party that had a bankruptcy? What we want are whatever the law requires the debtor to do for us. Do you want money from the debtor in this case? Oh, absolutely. And the debtor can only pay money consistent with the plan approved by the bankruptcy court, correct? That is not correct, actually. The debtor – I mean, again, I'll go back to Holliwell. I mean, the debtor in that case had to pay tax, even though the bankruptcy plan didn't provide for it. I'm sure it was pretty obvious in the bankruptcy in Holliwell that there would be a day when the IRS would want to be paid. Everyone knows about the IRS. Everyone knows they've got to pay tax. And there was no provision in the plan that they had to pay tax. And they still have to pay tax. Respectfully, you are over-reading Holliwell. Holliwell is about a tort that has nothing to do with distribution. It's separate and apart from the plan, and it does not lay down a broad rule that everything post-confirmation is automatically exempt. I'm likewise unpersuaded by your reading. You seem to suggest that people who purchase shares in the open market stand in the same relationship as someone who's a fetus in utero. Your clients went into this transaction with their eyes open. These releases were available to them. They stepped into the shoes of the people they purchased from. There's privity of contract. That is not the same as the Tenetron situation. Well, if there were privity of contract, then my client should have been paid a dividend. Because you can't have it both ways. If my client stepped into the shoes of their predecessors, if they got all of the obligations of their predecessors, then they had to have gotten all their rights. Mr. Gordon, you can't be an assignee of rights under a plan unless you've got a private contract. I think that's consistent with your decision in KD Toys. Mr. Gordon, your time expired a while back, and we've let you go. Now we're standing on clock, but we'll have you back on rebuttal. Thank you. Thank you. Mr. Rasmussen. Yes, good morning, Your Honors. May it please the Court, and thank you for letting me appear remotely here from Dallas. Thank you. The question before the Court is straightforward. Should the Court enforce and uphold the clear and unambiguous terms of the bankruptcy plan that was approved by over 99% of the voting unit holders, that was confirmed by the Canadian Bankruptcy Court, that was given full effect by the United States Bankruptcy Court, and that the debtors followed? The simple answer to that question is yes. The Court should affirm the well-reasoned and thorough opinion of the District Court, which affirmed the dismissal of the complaint on two independent grounds, the broad liability releases and the injunctions against lawsuits in the plan and court orders, and also the res judicata effect of the court order confirming the bankruptcy plan. I want to start on the releases. The plan contains a very broad release that covers all of the causes of actions that have been asserted here from Section 9.1. It covers all claims against ARTIC, the trustees, directors, officers, that any person may be entitled to assert, either at the time the release was approved or after that or in the future, based on any act or omission taking place on or prior to the plan implementation date, which was January 22, 2015, after all of the alleged wrongdoing occurred in this case. It's based on any act or omission that in any way relates to or arises out of the claims, including the equity claims, business affairs of the debtor, and the consolidated plan arrangement. There are two limits on these releases. I'm not sure that they're at issue in this case anymore, but there is an applicable law limitation in the third-to-last line of the release. So to the extent that otherwise applicable law imposed obligations that are exempted by the plan, then those would survive the releases. Do you disagree? I disagree, Your Honor. I think the release broadly weighs any liability arising out of or relating to performance of the plan, except to the extent that if there is an applicable law argument to be made, it would be in portions of the plan that are unrelated here. The plan did carve out provisions and say that subject to applicable law, the debtors and the monitor must act in a certain way, but that's not the case with respect to the distribution. The other concern I have about the releases is, don't we take all of this subject to how it was handed on by the Canadian courts in the sanction order, because this is a Chapter 15 proceeding recognizing a Canadian bankruptcy? Because the Canadian sanction order, paragraph 14, preserves claims based on gross negligence or willful misconduct. I'm not sure that remains a live issue in this case. Your opponents haven't argued it, but will you agree that that language preserves claims that depend on gross negligence or willful misconduct? I think you're right, Your Honor, that that's not an issue here. They haven't claimed that. No, I mean, that language is in the Canadian court order for sure, and it would preserve claims of gross negligence in the performance of the plan, but he's not claiming that we perform the plan in a grossly negligent way, so I don't think that covers them here, not to mention the fact that the sanction order, other portions of the sanction order, provide injunctions against lawsuits that don't have that same limiting language. It also has a declaration that the parties shall not incur any liability related to the payment and distribution to unit holders. That's in paragraph 40. It doesn't have that limiting language. Do you agree with opposing counsel who said that there was nothing in the plan that was inconsistent with complying with the disclosure requirements of FINRA? I'm sorry, I couldn't quite hear that, Your Honor. Your adversary, with some force, argued that there's nothing in the plan that would have prevented complying with the disclosure requirements. This is counts four, five, and six. Can you point to anything in the plan that preempted the disclosure requirements of FINRA, as opposed to the trenches of distributions? Your Honor, the plan is very clear about how the distribution was to be made. In section 6.2, it lays out the procedure for that. It says that the monitor shall declare a record date, and then the monitor shall transfer to the transfer agent the distribution that it determines should be made. And then within five business days, the transfer agent must transfer that to the registered unit holders as of the record date. Section 8.3 is very clear on how the plan procedure should be implemented, and then Schedule B has 30 steps on how this plan should be implemented. It's very comprehensive. It doesn't leave any room for other – and on top of that is the fact that where the plan wanted to impose additional applicable law requirements, it said so explicitly, like in section 6.10. It caveated it by saying subject to other applicable law. That's not found here, Your Honor, in section 6.2. In addition, I should point the Court to the section of the plan that says that the monitor shall be able to administer the plan and make the distribution payments without interference from any other person. That includes government agencies. And so I think it would conflict with the plan. I don't understand how it would have conflicted with the plan if the monitor had said, hey, we're sending a record date, but we've been using this terminology inconsistently. You should understand there's this X date coming, and we'll announce the X date on time. And then when the market doesn't move, would it have been inconsistent for the monitor to have said, hey, wait a second, you should pay attention to the fact that we've set a record date, but we haven't disclosed the X date yet? What would have been inconsistent, Your Honor, is if the payment had been made according to FINGER regulations, that is, to the unit holders as of the payment date rather than unit holders as of the record date. That absolutely would have been inconsistent with the plan and would have been prejudicial to the unit holders under the plan. That's only because you didn't pay attention to it when you were creating the plan, right? This was an oversight, was it not? You have to admit at least that. Your Honor, I don't think that we have the information on that in the record, so I couldn't admit that at this point. Perhaps that's the case, perhaps it was an oversight, but it's one that doesn't matter because the release completely bars any claims related to the payment of distributions here. Their argument is that the release can't absolve you or give you permission to do an illegal act. It seems like a pretty logical and straightforward argument. Why is that wrong? We didn't know it was an illegal act. We conformed with the plan. We effectuated the plan as required, and if courts can impose liability on debtors for following the plan, then that would be a very harmful precedent, I would say. Counsel, wasn't it possible, though, to comply both with the plan and with the requirements of FINRA? Where's the inconsistency? No, it wasn't possible, Your Honor, and I'll start by pointing out the fact that there was no obligation to harmonize the plan and FINRA. The appellants haven't pointed to any case law to support that argument. The one case that you cite, CARE Advances, says the opposite. It says the duty is to comply with the plan, notwithstanding what the securities regulations say. So, first off, there is no obligation, but even if there were, there wouldn't be a way to harmonize the plan here, given the amount of the distribution. The securities regulations would have required payment to unit holders of record as of the payment date, whereas the plan clearly requires payment to be made as of the fee. The securities regulations required it as of the payment date. The plan required it as of the record date. So, I don't think there's any way to harmonize the plan. The transfer proposal that the appellants had suggested would not have worked here. There's nothing in the plan that allows the monitor or the transfer agent to transfer and divide up the distribution. It requires the distribution to be paid according to the pro rata share. That's a stronger argument as to the transfers and the distributions, but what about the disclosures? What about just telling the market, here's the record date, here's the X date? Oh, the market hasn't moved. Just be aware that this is coming. There's a prolonged failure to say anything, even after, I believe, the fund admitted they were aware that the market hadn't moved and just didn't say anything. Well, I don't think there was any obligation for us to speak. I mean, you've got to keep in mind that the disclosure of the record date in the press release on December 15th only stated what the record date would be. It didn't state what the distribution would be, and so it's perfectly reasonable for the market to not correct when it didn't know what the distribution would be. For us to go out into the market and start saying, hey, you should have reacted differently based on our disclosure of the record date, I don't think that would have been appropriate, and we certainly didn't have any obligation to do that, especially considering the broad language of the release that bars any claims against the Arctic, against its agents, or any liability associated with performing the plan and making the distribution. I guess what neither of you is giving us is a limiting principle. It cannot be that a trustee can get into a car accident driving payment to a bank and say we have complete immunity from car accidents because that would hinder the plan. One side is telling us none of it's preempted, and the other is saying it's all preempted, and it's obviously something in between, but you're not making a strong line. I think the limiting principle is what arises out of and relates to plan performance. A car accident on the way to make the wire transfer or to mail the check, to me, would not be arising out of relating to it. There's a separate duty of care that you owe to someone if you run into them, but that would not be covered by the release. But declaring the record date, transferring the money to the transfer agent, having the transfer agent send it out to the unit holders as of the record date, all of that has to be covered by the plan release. Otherwise, the plan release would have absolutely no meaning, and it would be extremely harmful to the bankruptcy process if we can't enforce releases like this. So that's what I think is the operating principle there to answer your direct question, Your Honor. In the time that I have remaining, I just want to address a couple of points that Mr. Gordon made. You know, he's argued that the releases don't apply because the voting unit holders didn't hold the specific legal claims asserted here, but that's just not true. The causes of action all pertain to how the distribution should be made, and as I said, the releases broadly cover any claim brought by any person related to the payment of distribution. Section 11.1 says that the plan will be binding on every unit holder, and each unit holder will have deemed to have consented and agreed to all the provisions in the plan in its entirety as of the plan implementation date. As of that date, January 22nd, the appellants were all unit holders, so this plan has to be binding on them. The argument that the due process rights of the appellants were somehow violated is absolutely wrong. The unit holders received actual notice of this plan. There was a meeting called, and a vote was held on it, and over 99 percent of the voting unit holders approved the terms of the plan, and those terms are binding on the successors and assigned under Section 1.3 of the plan. And the case law is strong that when a purchaser of a claim in bankruptcy acquires that claim, he inherits all of the rights and obligations and encumbrances associated with that claim. The terms of the plan have to travel with that claim, otherwise the bankruptcy process will be totally upset and we won't have finality of our bankruptcy orders. So I think that's the real harm here. I would ask the Court to affirm the lower court's decision on both the release argument and the res judicata argument, and I'm happy to address any questions that the Court may have. Hearing no further questions, thank you, Mr. Rasmussen. And, Mr. Gordon, you may have rebuttal. Okay, thank you. I think, briefly, I may have misunderstood a question earlier about whether the bankruptcy strip of the releases. Of course we do not believe the releases are enforceable to the extent that they are unlawful. We think that it's – I think that I misunderstood it. Where in your briefing did you preserve that argument? Well, first of all, it's way below. And, second of all, I think it's abundantly clear from all of our arguments in the first half of the brief, we think that there have been violations of law, but we should be allowed to pursue them. And, again, I'm not sure that we would necessarily need to say that because I think it is to some degree redundant. If a release is violent of a law, which we've said, and if there's an absolute right to pursue claims post-confirmation, notwithstanding the releases, I think we've preserved it. I didn't see that in your briefing. Okay. Well, the argument – on oral argument – Counsel, Counsel, just to verify that, because I share Judge Vivas' concern, I don't see the word unlawful anywhere in your opening brief. Can you tell me where you – obviously, if you made the argument that the releases were unlawful, the word unlawful would appear. Sure. Well, I mean, we say that there are violations of the process clause, which would mean that they're unlawful. And it also argues – and I think there's also a very substantial redundancy between the race judicata argument and the release argument as well. I mean, the concept here is they are trying to – based on the terms of a plan. The race judicata argument is based on the terms of a plan. We're saying the plan forecloses the claims. The plan includes the releases. So when we say the race judicata cannot preclude the claims, that also extends the releases, which is what they're relying on in part. So I do think that by saying that the plan is not race judicata of our claims, it also – because the plan includes the releases, we're also arguing that the plan cannot – to the extent that it consists of a law, preclude the claims. So I think it's in the brief. I mean, it's very hard to go through the entire brief, but I can tell you that, for sure, we argue that it is a violation of the Constitution, which is part of the law. And we argue that the race judicata principle, which extends to the releases, does not preclude the claims. Now, and obviously we're asserting that on oral arguments as well. Now, you had asked for a limiting principle. We're not going to make that up, actually. We're going to go right to the statutes, because there is a limiting principle in 11 U.S.C. 1142. And that says that a debtor is permitted to disregard non-bankruptcy law relating – direct quote – relating to financial conditions. It doesn't say anything about an exemption relating to any other laws. So I'm not – you know, I'm just not going to suggest to you anything that's not well-grounded or something. That is where the issue – that is the limiting principle. And our claims do not relate to the financial conditions of the debtor. That helps you on race judicata, but it doesn't – it saves you on the releases, does it? Well, okay, let me go to the releases. I mean, you know, the first claim that I've already addressed a moment ago is that you can't have a release that violates the law. I don't know that we necessarily have that language in the release to save us from that. I would think that as a matter of public policy, the court doesn't enforce releases that violate the law. But, okay, let's – I think we've both got the language that protects my clients, but it also debates the principle of law that you don't enforce in illegal contract laws. But let's talk about why these releases don't bind my clients. As I said on my initial term, my clients are not the assignees of their predecessors. If they were, then it's pretty clear that the company – the debtor should have paid my clients. You can't have it both ways. You can't be assignees under a bankruptcy plan and be subject to its obligations but not the rights that it grants. So it's – I think that's the main problem here. If they're assignees, they are assignees, then it becomes pretty clear that judgment should be entered in favor of my clients. Counselor, so I think you are – you inherit rights, but then your remedy is an action against those you purchased from who mistakenly received the distribution because it was after the record date, but they owe it to you because you purchased after that date. But that's not a remedy against the plan or the trustees. Well, they're actually – I don't think that that's right. You don't think that you have that remedy available to you? I do think that there would be possibly a remedy against those who wrongfully received the money, but that doesn't mean there's not also a remedy against the person who distributed the money incorrectly. They can't take the position, on the one hand, that my clients are bound by reason under the plan, while at the same time taking the position that my clients weren't entitled to whatever payments they were making under the plan. It seems to me that there's a breach of – if my clients are assignees, then there's a breach of contract, a breach of the plan against the debtor. Thank you, Mr. Gordon. Your time on rebuttal expired a little bit ago. Thank you very much, and thank you to both of counsel in a highly technical but very interesting case, which we've all enjoyed preparing for and appreciated your argument and your availability telephonically. We'll take the matter under advisement.  Thank you.